UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Crim. No. 5:25-cr-00127-GFVT-MAS-8 |
| | ) | |
| v. | ) | |
| | ) | **OPINION** |
| QUINCINO LAMONT WAIDE, JR., | ) | **&** |
| | ) | **ORDER** |
| Defendant. | ) | |
| | ) | |

*** *** *** ***

This matter is before the Court on Defendant Quincino Lamont Waide, Jr.'s Motion to Dismiss the Superseding Indictment. [R. 221.] When the grand jury returned an indictment on October 2, 2025, initiating this matter, Waide was not one of the six Defendants charged. [R. 1.] However, on November 6, 2025, a superseding indictment was returned, which named two additional Defendants, including Waide. [R. 86.] In the superseding indictment, Waide was named as the sole Defendant in the added charged offense of Accessory After the Fact, in violation of 18 U.S.C. § 3. *Id.*

Waide asserts that this charge has been brought against him because he refused to cooperate with the government, and thus, the prosecutor acted vindictively, punishing him for asserting his protected rights. [R. 221.] Essentially, Waide asks whether a prosecutor behaves vindictively by adding a Defendant to an indictment after that Defendant refuses to act as a cooperating witness. Because Waide cannot demonstrate a sufficient prosecutorial stake in the exercise of his protected rights or that the prosecutor acted unreasonably, Defendant Waide's Motion to Dismiss the Superseding Indictment **[R. 221]** is **DENIED**.

**I**

This matter was initiated by an indictment returned by a federal grand jury on October 2, 2025. [R. 1.] The indictment charged six individuals in connection with the murder of federal witness Kristopher Lewis. *Id.* The United States alleges that the Defendants were hired to murder Lewis to prevent his anticipated testimony against co-Defendant Rollie Deshawn Lamar in his federal criminal trial for narcotics trafficking and money laundering charges. *Id.*

A superseding indictment was returned on November 6, 2025, which named two additional Defendants, including Quincino Lamont Waide, Jr. [R. 86.] Waide was named as the sole Defendant in the added charged offense of Accessory After the Fact, in violation of 18 U.S.C. § 3. *Id.* As the basis for this charge, the United States alleges that Waide facilitated access to a getaway vehicle and disposal of the "murder vehicle" on behalf of co-Defendants Daquis Sharp, Jatiece Parks, William Dixon, and Desmond Bellomy after they committed the murder. *Id.* The United States believes that many of the Defendants, including Waide, are members of the Hot Boyz, a criminal street gang in Lexington, Kentucky. [R. 228 at 3-4.]

Waide was first interviewed by law enforcement regarding his possible involvement in the Lewis murder on August 14, 2024, in a meeting facilitated by Waide's probation officer, unbeknownst to Waide. [R. 221-1 at 2.] At this meeting, the officer advised Waide that his name had come up in the investigation of the Lewis homicide due to his involvement with the suspects. [R. 224.] Waide denied any involvement with the Hot Boyz, claiming that they were family friends of his, rather than direct associates. *Id.* During the meeting, the officer indicated to Waide that he "didn't think that [Waide] killed anybody, but [he] may have played a part in it," which could make him "complicit to murder because [he] was paid for his involvement." *Id.*

2

The officer further advised Waide that "the only way for [Waide] to help eliminate [him]self" was to tell the detective why his name came up in the investigation. *Id.* The officer then told Waide about text messages that law enforcement believes implicate Waide, by showing that he received payment from co-Defendant Dixon, one of the alleged gunman, on the day of the murder. *Id.* Waide then asked for an attorney, and the questioning ceased. *Id.*

Waide's next relevant contact with law enforcement occurred in September 2024, when the United States Attorney's Office sent Waide a target letter which stated, "FBI is investigating allegations that you assisted in a homicide that occurred in Lexington, Kentucky in Fall 2023 and that you received financial compensation for your assistance with the homicide." [R. 221-2.] The letter noted that a grand jury would soon meet to determine whether, and if so which, federal charges would be brought. *Id.* The letter further stated "[t]his letter constitutes an invitation to obtain an attorney and to meet with federal prosecutors to discuss a potential pre-indictment resolution of the potential charges. . ." *Id.* Waide did not respond to the letter.

Then, in April 2025, the Lexington Police Department (LPD) obtained a search warrant to search Waide's phone for evidence relating to the Lewis homicide, as well as an unrelated shooting that occurred in October 2024. *See United States v. Waide*, No. 5:25-cr-73-GFVT-MAS [R. 35 therein.] When officers attempted to execute the search warrant, they encountered Waide outside his residence, and upon announcing their presence, Waide fled inside the residence. *Id.* Waide exited the residence approximately twenty-five minutes later. *Id.* Law enforcement then obtained a search warrant for the residence, and while searching the residence, they found a firearm and various ammunition, as well as Waide's phone, which had been factory reset. *Id.* Officers arrested Waide and initially charged him with fleeing and evading. *Id.*

Following this interaction, on April 24, 2025, LPD and Federal Bureau of Investigation (FBI) officers met with Waide again to discuss the Lewis homicide. [R. 224.] The detectives conveyed to Waide that the United States would be seeking the death penalty in the case arising out of the Lewis homicide and noted that Waide would be "looking at life in prison or something higher" if he were convicted in that case. *Id.* The officers showed Waide the evidence that they believed implicated him, and Waide declined to speak to detectives and requested an attorney. *Id.*

On May 19, 2025, the United States filed a criminal complaint charging Waide with possession of a firearm or ammunition after having been convicted of a misdemeanor crime of violence, in violation of 18 U.S.C. § 922(g)(9). *United States v. Waide*, No. 5:25-cr-73-GFVT-MAS [R. 1 therein.] In the joint preliminary and detention hearing conducted in that matter, FBI Special Agent Isaac Robison testified as to his understanding of Waide's involvement with the Hot Boyz, as well as evidence connecting Waide to the murder of Kristopher Lewis. [R. 221-4.] On June 5, 2025, a grand jury returned an indictment on this charge. *United States v. Waide*, No. 5:25-cr-73-GFVT-MAS [R. 10 therein.] Waide pled guilty to this charge and was sentenced by this Court to fifteen months imprisonment, followed by three years of supervised release, on January 13, 2026. *Id.* at R. 36; R. 44.

On August 21, 2025, while Waide's firearm charge remained pending, and before any indictment had been returned in the instant case, the Assistant United States Attorney assigned to both cases sent an email to counsel for Waide, asking her to "remind Waide about the proffer opportunity" in the then-forthcoming Lewis homicide case. [R. 221-6.] The prosecutor indicated that Waide would likely not need to testify against anyone in the instant case, but if he otherwise cooperated, he would likely not be charged at all. *Id.* The prosecutor also indicated

4

that she may be able to recommend a time-served sentence for Waide's firearm charge "if [Waide] was honest with [the United States] during the proffer." *Id.* Just as he had done before, Waide declined the request for his cooperation.[1]

On September 4, 2025, the prosecutor reached out to counsel for Waide by e-mail, informing her that a message had been conveyed to Waide to "keep his mouth shut." [R. 228-5.] The prosecutor reiterated her offer to Waide, noting that she did not need him to testify and that the meeting would be "almost exclusively to his benefit (with some time-saving benefit to [the United States] if [they] can avoid charging [Waide] with a homicide related offense)." *Id.* The prosecutor and counsel for Waide communicated a handful of times between September 4, 2025, and September 19, 2025, but after September 19, 2025, did not have any contact until after the Superseding Indictment was returned in the instant case. [R. 228 at 10-11.]

Waide now moves to dismiss Count Six of the Superseding Indictment, arguing that the Superseding Indictment was the product of prosecutorial vindictiveness. [R. 221.] The United States filed has its Response and Waide has filed his Reply. [R. 228; R. 232.] In order to allow the parties to further develop their arguments, the Court set the matter for a hearing on May 6, 2026. [R. 235.] The matter is now fully briefed and ripe for review.

**II**

While the prosecution has "broad discretion" in deciding who to prosecute and which charges to bring, such discretion is "not unfettered." *United States v. Ladeau*, 734 F.3d 561, 566 (6th Cir. 2013) (citing *Bragan v. Poindexter*, 249 F.3d 476, 481 (6th Cir. 2001)). The Due

---

[1] Waide stated in his Motion that he "declined the invitation to meet with the government;" however, the written record provided does not indicate that he responded at all to the request. [*See* R. 221-4.] Because the United States does not contest that it had notice of Waide's desire to not cooperate, and it is ultimately inconsequential, the Court will assume that Waide otherwise communicated with the prosecutor in response to this request.

Process Clause prohibits the Government "from punishing a defendant for exercising a protected statutory or constitutional right" by bringing additional charges against the defendant. *Id.* To that end, the doctrine of prosecutorial vindictiveness evolved as a prophylactic rule. *See Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). It seeks not only to prevent the Government from retaliating against defendants' lawful assertion of rights, but also to protect them from "the fear of such vindictiveness" so that they will not be deterred from exercising their rights. *United States v. Goodwin*, 457 U.S. 368, 373–74 (1982).

If a defendant asserts a protected right and the Government then charges him in a subsequent indictment, a court can dismiss the indictment if a defendant shows "actual vindictiveness" or a "realistic likelihood of vindictiveness" based on the particular facts of the case. *LaDeau*, 734 F.3d at 566. Actual vindictiveness requires the defendant to prove with objective evidence that the prosecutor's motive was to punish the defendant for exercising his legal rights. *Id.*

Alternatively, the defendant can demonstrate a realistic likelihood of vindictiveness without requiring a court to undertake the unseemly task of prying into a prosecutor's subjective intentions. *United States v. Andrews*, 633 F.2d 449, 455 (6th Cir. 1980) ("If the standard to be applied was proof of actual vindictiveness, a trial judge would have the Hobson's choice of either not barring the extra charge or of saying that a prosecutor acted wrongly. . . . We do not think that such confrontations before the judiciary and the executive branch are desirable."). To evaluate these claims, courts assess the prosecutor's conduct from the objective perspective of a reasonable outside observer. *Id.* at 454. Doing so ensures that defendants can freely exercise their rights without requiring a court to accuse a particular prosecutor of bad faith behavior. *See Goodwin*, 457 U.S. at 376.

6

District courts have discretion to find a realistic likelihood of vindictiveness. *LaDeau*, 734 F.3d at 565. To do so, the Court must scrutinize the circumstances involved because "[e]ach situation will necessarily turn on its own facts." *Id.* at 567 (quoting *Andrews*, 633 F.2d at 453–54). A *prima facie* case of vindictiveness is established upon a showing that: (1) the Defendant exercised a protected right, (2) a prosecutorial stake in the exercise of that right, (3) unreasonableness of the prosecutor's conduct, and (4) the intent to punish the defendant for exercise of the protected right. *United States v. Suarez*, 263 F.3d 468, 479 (6th Cir. 2001).

If the defendant can make a sufficient initial showing, the court presumes an improper vindictive motive, and the Government "bears the burden of rebutting the presumption with 'objective, on-the-record explanations' such as 'governmental discovery of previously unknown evidence' or 'previous legal impossibility.'" *Id.* at 566 (quoting *Poindexter*, 249 F.3d at 482). Naturally, to bring a claim for prosecutorial vindictiveness, the Defendant must first demonstrate that "the allegedly vindictive government action occurred following the exercise of a protected right." *United States v. Moon*, 513 F.3d 527, 535 (6th Cir. 2008).

Waide explicitly does not claim actual vindictiveness in this case. [R. 232 at 1.] Instead, he contends that the course of events leading to the superseding indictment indicate a realistic likelihood of vindictiveness. *Id.* Thus, to give rise to a presumption of vindictiveness, Waide must show that: "(1) the prosecutor has some stake in deterring the . . . exercise of his rights and (2) the prosecutor's conduct was somehow unreasonable." *LaDeau*, 734 F.3d at 566 (quoting *Bragan*, 249 F.3d at 481). The Court assesses each in turn.

7

A

1

As a threshold inquiry, Waide must demonstrate that he asserted a protected right.  Waide posits that he asserted a protected Fifth Amendment right when he refused to cooperate with law enforcement and the prosecution.  [R. 221-1 at 13.]  In relevant part, the Fifth Amendment provides that no person "shall be compelled in any criminal case to be a witness against himself."  U.S. Const. amend. V.  This protection extends beyond the context of a criminal trial, and similarly permits a person to refuse to answer, "official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answer might incriminate him if future criminal proceedings."  *Lefkowitz v. Turley*, 414 U.S. 70, 77 (1973).

Here, Waide contends that his refusal to cooperate with the prosecution is protected by the Fifth Amendment, and he therefore asserted a protected right when he either declined or did not respond to the United States' requests for him to cooperate.  [R. 221-1 at 13.]  The United States retorts that there is no freestanding right to not cooperate, and the Supreme Court has noted that all citizens in fact have a *duty* to cooperate with law enforcement.  [R. 228 at 19-21.]  Further, the United States contends that even if there is a right to not cooperate, that right must be firmly rooted in the Fifth Amendment and explicitly asserted, which Waide did not do.  *Id.* at 22-23.  The Court addresses these arguments in turn.

a

Beginning with whether there is a "right to not cooperate," the Court first notes that there is some variance among courts as to whether this right exists at all and if so, the extent to which it exists.  *See e.g. United States v. Williams*, 47 F.3d 658, 662 (4th Cir. 1995) (". . .a defendant has the right not to cooperate. . ."); *United States v. Tingle*, 658 F.2d 1332, 1336, n.5 (9th Cir.

8

1981) ("refusal to cooperate is every defendant's right under the fifth amendment."); *but see United States v. Long*, 823 F.2d 1209, 1211 (7th Cir. 1987) ("[F]ar from having a right not to cooperate, every citizen has a *duty* to cooperate and report criminal activity, a duty grounded in the responsibilities of community life."); *United States v. Paguio*, 114 F.3d 928, 930 (9th Cir. 1997) ("There is no constitutional right not to 'snitch.'").  While at first blush these positions may seem irreconcilable, this discrepancy is less of a disagreement between circuits but rather, can be properly accounted for by considering the specific facts of each case.

As support for his claim that there is a right to not cooperate, Waide cites a case out of the Ninth Circuit, *United States v. Tingle*, which states in a footnote that "refusal to cooperate is every defendant's right under the fifth amendment."  658 F.2d at 1336, n. 5.  Notwithstanding that *Tingle* is not binding on this Court, as is so often the case, context matters here.  In *Tingle*, the Ninth Circuit considered whether the defendant's confession was coerced when, in the context of a custodial interrogation, law enforcement told the defendant that if she did not cooperate, she would not see her child for "a long time" and the officer would tell the prosecutor that the defendant was "stubborn or hard-headed."  *Id.* at 1335.

When read in context, *Tingle* at most held that it is improper for law enforcement to use a defendant's failure to cooperate to coerce them into a confession.  *See id.*  Furthermore, this fact was not considered in isolation.  Contrary to Waide's assertions, *Tingle* did not hold that defendants have an unequivocal right not to cooperate.  Rather, it held that, under the circumstances of that case, the defendant had a Fifth Amendment right not to incriminate herself, and at times, the right not to cooperate may fall within the confines of that right.  *Id.*

The case cited by the United States, *Roberts v. United States*, provides some guidance, but similarly does not entirely resolve the issue.  445 U.S. 552 (1980).  In *Roberts*, the Supreme

Court was confronted with whether a district court could consider a defendant's refusal to cooperate as a factor in imposing a sentence upon that defendant. *Id.* at 553. The defendant in *Roberts* asserted that the sentencing judge improperly punished him for invoking his Fifth Amendment right to remain silent by considering his refusal to cooperate in imposing a sentence. *Id.* at 559. The Court held that the defendant's refusal to cooperate was properly factored into his sentence noting that "gross indifference to the duty to report known criminal behavior remains a badge of irresponsible citizenship." *Id.* at 558.

Just as before, the context here matters. In *Roberts*, the Court primarily grounded its decision, not in the fact that a defendant will never have a right to not cooperate, but because of the "fundamental sentencing principle that a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the information he may consider of the source from which it came." *Id.* at 556. Thus, the Court could consider the fact that the defendant refused to cooperate insofar as it illuminated the inquiry into the defendant's characteristics as a whole and whether he was likely to re-offend in the future. *Id.* In fact, the Court noted that, had the defendant raised his concerns about self-incrimination to the sentencing judge, his argument that the sentencing judge improperly drew adverse inferences from his right to remain silent "would have merited serious consideration." *Id.* at 559. But the defendant had not raised these concerns until much later, and thus, the Court did not give them weight. *Id.*

To be sure, plenty of dicta in *Roberts* could be fairly read as entirely foreclosing that a right to not cooperate could ever exist. *See e.g. id.* at 557 (noting that the "deeply rooted social obligation" to avoid concealing the crimes of others "is not diminished when the witness to crime is involved in illicit activities himself."). But on closer inspection, *Roberts* clearly left open the possibility that at times a defendant may have a right to not cooperate, assuming that

10

right is otherwise within the parameters of the Fifth Amendment. *Id.* at 558. ("Unless [a defendant's] silence is protected by the privilege against self-incrimination. . .the criminal defendant no less than any other citizen is obliged to assist the authorities.").

The cases interpreting *Roberts* confirm this conclusion. In one such case, *United States v. Goff*, the defendant refused to testify before a grand jury in relation to a drug investigation, even after the district court issued an order granting him immunity for his testimony and compelling him to testify. 400 F. App'x 1, 6 (6th Cir. 2010). Subsequently, the government obtained a superseding indictment that included charges against the defendant, which the defendant moved to dismiss for vindictive prosecution. *Id.* In addressing the defendant's vindictive prosecution claim, the Sixth Circuit held that the defendant had not shown that he exercised a protected right when he refused to cooperate because his refusal to testify was not otherwise protected by the Fifth Amendment. *Id.* at 24. The Court noted that "the Fifth Amendment privilege against self-incrimination 'is grounded on a reasonable fear of danger of prosecution.'" *Id.* (quoting *United States v. Damiano*, 579 F.2d 1001, 1003 (6th Cir. 1978)). Because the defendant had been granted immunity by the district court, he was not in reasonable fear of danger of prosecution and did not have any accompanying Fifth Amendment right to refuse to cooperate. *Goff*, 400 F. App'x at 24.

In sum, the United States is correct that there is no "freestanding" right not to cooperate, but that does not mean there is no right at all. If an individual reasonably believes that his cooperation against others may place himself in danger of prosecution, the Fifth Amendment protects his right to decline to cooperate and in turn incriminate himself. However, both Supreme Court and Sixth Circuit precedent make clear that this right must be firmly grounded in the Fifth Amendment privilege.

Although not required, this conclusion is in harmony with the two out of circuit cases relied upon by the United States. In both cases, the defendants cited safety concerns, rather than self-incrimination considerations, as grounds for their refusal to cooperate. *Williams*, 47 F.3d at 660; *Long*, 823 F.2d at 1211. In *Williams*, the Court noted that a defendant "has the right not to cooperate," but implied that this right may not be "protected" in the way that is required to sustain a prosecutorial vindictiveness claim. 47 F.3d at 662 ("Although a defendant has the right not to cooperate, a prosecutor may pressure a defendant to waive that right by threatening a more severe indictment."). Instead, the Court was content to rest its holding on the premise that "the right to not cooperate is certainly no more important than the right of an accused to a trial," noting that the Supreme Court allows prosecutors to threaten defendants with a harsher indictment to pressure them to forego trial and enter a plea of guilty. *Id.*

On the other hand, in *Long*, the Court explicitly held that the defendant had not asserted a protected right, citing *Roberts* to note that "far from having a right not to cooperate, every citizen has a *duty* to cooperate and report criminal activity, a duty grounded in the responsibilities of community life." 823 F.2d at 1211 (citing *Roberts*, 445 U.S. at 558). However, as noted above, the Fifth Amendment was not otherwise at issue in *Long* because the defendant's only grounds for his refusal to cooperate were concerns for his safety, not Fifth Amendment considerations. *Id.* at 1210. Thus, *Long* confirms the general consensus that the right to not cooperate is not a separate protected right, but it did not hold that refusal to cooperate would never constitute exercise of a protected right. *See id.* at 1211-12. As such, the question in the instant matter is not whether general "right to not cooperate" exists or not, but rather, whether in this particular instance, Waide's refusal to cooperate was otherwise protected by the Fifth Amendment.

**b**

Having concluded that to the extent a right to not cooperate exists, it must be otherwise grounded in the Fifth Amendment, the Court next considers whether Waide in fact invoked his Fifth Amendment rights when he declined to cooperate with the government.  The United States contends that Waide did not invoke his right to remain silent as grounds for his refusal to cooperate, and thus, has not properly asserted any protected right for which he was prosecuted vindictively.  [R. 228 at 21-23.]  Waide retorts that he repeatedly and explicitly invoked his right to remain silent by requesting counsel on multiple occasions; therefore, his refusal to cooperate was protected by the Fifth Amendment.  [R. 232 at 2.]

As a general matter, the Fifth Amendment right to remain silent is "not self-executing" and may not be relied upon "unless it is invoked." *United States v. Davis*¸ 919 F.2d 1181, 1186 (6th Cir. 1990) (quoting *Roberts*, 445 U.S. at 559). "Although 'no ritualistic formula is necessary in order to invoke the privilege,' a witness does not do so simply by standing mute." *Salinas v. Texas*, 570 U.S. 178, 181 (2013) (quoting *Quinn v. United States*, 349 U.S. 155, 164 (1955)). Even when the prosecutor or law enforcement officer "has reason to suspect that the answer to his question would incriminate a witness," the defendant must expressly invoke the privilege. *Salinas*, 570 U.S. at 187.

There are several occurrences on which Waide contends he asserted his Fifth Amendment right to remain silent.  First, the August 2024 meeting with law enforcement arranged by Waide's probation officer, at which Waide first denied any involvement with the Hot Boyz and then asked for an attorney after law enforcement alluded to payments and photographs that implicated Waide.  [R. 224.]  Second, the United States sent Waide a target letter in September of 2024 which advised Waide that the FBI was investigating allegations that Waide assisted in a

13

homicide, and invited Waide to obtain an attorney and meet with prosecutors to discuss pre-indictment resolution of the potential charges against him. [R. 221-2.] Waide did not respond to the target letter.

Next, in April of 2025, following Waide's arrest and the subsequent execution of a search warrant at Waide's residence, officers again met with Waide to discuss the Lewis homicide. [R. 224.] Waide did not speak to detectives and requested an attorney. *Id.* And finally, in the fall of 2025, prosecutors twice reached out to Waide through counsel to seek his cooperation. [R. 221-6; R. 228-5.] Waide asserts that he declined the United States' invitations, although the record provided to the Court reflects that the requests went without response. *See id.*; [R. 221-1 at 8.] At no point did Waide or his counsel explicitly assert Waide's Fifth Amendment rights as grounds for his disinterest in speaking to prosecutors; however, Waide asserts that his prior requests for counsel are sufficient to invoke his Fifth Amendment right to remain silent. [R. 232 at 2-3.]

At the outset, the Court notes that between the Motion and the Reply, Waide changed the calculus on this particular issue. In his Motion, Waide asserted that his refusal to cooperate was protected by the Fifth Amendment, but he did not attempt to explain how he invoked this right. [R. 221-1 at 13.] In his Reply, presumably recognizing that this right must be firmly grounded in the Fifth Amendment and thus properly invoked, Waide asserted that he invoked his Fifth Amendment right to not cooperate by expressly requesting counsel on multiple occasions. [R. 232 at 2-3.] This muddies the waters a bit because Waide does not necessarily contend that he is being vindictively prosecuted because he invoked his right to counsel. However, Waide's invocation of his right to counsel on both occasions was in response to a request for his

14

cooperation.  As such, Waide's request for counsel caused questioning to cease on two occasions, and therefore functioned as a refusal to cooperate on those occasions.

Although at times the right to remain silent and the right to have counsel present during questioning are subject to different analyses, they are not separate rights in a technical sense. Rather, the right to have counsel present is a procedural safeguard meant to preserve the core protection of the Fifth Amendment, the right against compulsory self-incrimination.  *Davis v. United States*, 512 U.S. 452, 457 (1994).  As such, when Waide asserts that he has a right to not cooperate, he may effectively invoke this right by requesting counsel when presented with an offer to cooperate, insofar as that invocation functions as a refusal to continue speaking with law enforcement and in turn cooperate with them.

To that end, during the August 2024 and April 2025 meetings with law enforcement Waide explicitly invoked his Fifth Amendment right to remain silent when he unambiguously requested an attorney.  The United States does not contend otherwise.  Further, Waide's invocation of this right functioned as a denial of the government's requests for him to cooperate because questioning had to cease.  Accordingly, whether styled as a "right to not cooperate" or some other right, Waide did assert a protected Fifth Amendment right on at least two occasions prior to his addition to the superseding indictment in this case.

Conversely, on the occasions which Waide either did not respond to the prosecution's requests for cooperation or declined through counsel without asserting the Fifth Amendment as grounds for such refusal, he did not assert a protected right.  Although "no talismanic phrase is essential in order to invoke the privilege against self-incrimination," invoking the right to remain silent requires a sufficiently clear statement so that "a reasonable officer would perceive it as such under the circumstances."  *Emspak v. United States*, 349 U.S. 190, 194 (1955); *Franklin v.*

15

*Bradshaw*, 545 F.3d 409, 414 (6th Cir. 2008).  In response to the target letter and the e-mail communications from the prosecutor, the Court is not aware of any statement made by Waide or on Waide's behalf that functioned as a sufficiently clear statement invoking his Fifth Amendment rights.

Waide avers that because the government intended to illicit inculpatory statements from him, his silence in the face of their requests suffices to invoke his Fifth Amendment right to remain silent.  [R. 232 at 2.]  Notably, the Supreme Court has expressly rejected adopting such an exception to the invocation requirement, noting that it has "repeatedly held that the express invocation requirement applies even when an official has reason to suspect that the answer to his question would incriminate the witness."  *Salinas*, 570 U.S. at 186-87 ("Our cases all but foreclose such an exception, which would needlessly burden the Government's interests in obtaining testimony and prosecuting criminal activity.").

Only in limited circumstances may silence constitute an invocation of the Fifth Amendment right to remain silent.  Specifically, "a witness need not expressly invoke the privilege where some form of official compulsion denies him 'a free choice to admit, to deny, or to refuse to answer.'"  *Id.* at 185 (quoting *Garner v. United States*, 424 U.S. 648, 656-57 (1976)).  Waide cannot meritoriously contend that he was under such compulsion when he remained silent in the face of the prosecution's requests.  The target letter was just that, a letter sent to his home which merely served as an invitation to meet with the prosecutor.  The other requests for his cooperation, which he either declined or did not respond to, were communicated to him through counsel, and clearly outside of any custodial setting.  Furthermore, the best evidence that Waide faced no compulsion to answer the prosecution's requests comes from the fact that in the face of these requests, he was able to, and did in fact, remain silent.

16

**2**

At any rate, even if some of Waide's pre-indictment actions constituted an exercise of a protected right, the United States did not have any substantial stake in deterring the exercise of these rights. Generally, prosecutors do not have a sufficient stake in pre-trial proceedings to indicate a realistic likelihood of vindictiveness. At this stage, a prosecutor might find new evidence that suggests a basis for an additional charge or might realize that the evidence on hand has "a broader significance." *Goodwin*, 457 U.S. at 381. During pre-trial, "the prosecutor's assessment of the proper extent of prosecution may not have crystallized." *Id.* "In contrast, once a trial begins—and certainly by the time a conviction has been obtained—it is much more likely that the [prosecutor] has discovered and assessed all of the information against an accused and has made a determination, on the basis of that information, of the extent to which he should be prosecuted." *Id.*

Although rare, prosecutorial vindictiveness can be found in some pre-trial circumstances. The likelihood that a charge is vindictive increases proportionately to the "burden that the defendant's conduct has placed on the prosecution." *LaDeau*, 734 F.3d at 569. A prosecutor has a stake in discouraging the exercise of a right where it could lead to "increased expenditures of prosecutorial resources" or where it could lead to "a formerly convicted defendant going free." *Goodwin*, 457 U.S. at 376. There can be no reasonable likelihood of vindictiveness where "the additional burden on the prosecution from the motions in proportion to the burden for the upcoming trial itself [is] rather minimal." *LaDeau*, 734 F.3d at 568 (quoting *United States v. Suarez*, 263 F.3d 468, 479-80 (6th Cir. 2001)). As such, routine motions, like motions to suppress, motions challenging the sufficiency of the indictment, and even some motions to dismiss, do not give rise to a likelihood of vindictiveness because they are ancillary to the burden

17

that the government carries to try any case. *See Goodwin*, 457 U.S. at 381; *Suarez*, 263 F.3d at 479–80.

Waide asserts that the government has run into "significant barriers" in prosecuting Waide's co-Defendants in the past because individuals are reluctant to testify against them, as doing so "not only invites significant danger to their own lives but the lives of their family and other loved ones." [R. 232 at 4.] Thus, Waide contends that the government "must secure witnesses by creating circumstances of compulsion." *Id.* at 5. At the hearing conducted in this matter, Waide emphasized the repeated and "unrelenting" requests for cooperation from the prosecution, noting that requests for cooperation are typically initiated by the defendant, rather than the prosecution. [R. 251 at 16-17.] Waide avers that this "gives the impression that his testimony [was] important or critical to their case." *Id.*

In response, the United States points the Court's attention to its correspondence with Waide, where the prosecutor explicitly stated that Waide's cooperation would be "almost exclusively to his benefit (with some time-saving benefit to [the United States] if [the government] can avoid charging [Waide] with a homicide-related offense." [R. 228-5.] Further, the United States notes that it was able to indict all seven other co-Defendants without Waide's cooperation and possesses a plethora of evidence against all of the Defendants, none of which depended on Waide's cooperation. [R. 228 at 26.] Finally, in response to Waide's contention that it is out of the ordinary for the prosecution to reach out to a defendant to ask for their cooperation, the United States submits that this case is quite extraordinary, particularly in terms of the potential penalty for Waide's co-Defendants, and "perhaps there is a human reason to approach [Waide] about cooperating." [R. 251 at 19.]

Upon review, any interest the prosecution had in Waide's cooperation is minimal and certainly does not rise to the level of prosecutorial stake required to sustain a reasonable likelihood of vindictiveness. To the Court's knowledge, in a pre-trial setting, the Sixth Circuit has only twice found a significant prosecutorial stake and accompanying presumption of vindictiveness. *See Zakhari*, 85 F.4th at 381; *Ladeau*, 734 F.3d at 569. Notably, both cases involved motions to suppress that, if successful, would have "presented a grave threat to the prosecution's case." *Zakhari*, 85 F.4th at 382.

First, in *Ladeau*, the Sixth Circuit concluded that there was a significant prosecutorial stake in deterring the defendant's exercise of his rights when he successfully moved to suppress "crucial evidence and thereby eviscerated the government's [] case." 734 F.3d at 569. The Court noted that the defendant's motion was "neither routine nor typical" because it had the potential to, and did in fact, eliminate the prosecution's ability to prosecute a charge in the indictment. *Id.* ("Obtaining [the defendant's] conviction on the initial charge. . .became not simply more of a chore for the prosecution than it had been before; it became impossible.").

Second, in *Zakhari*, the Sixth Circuit found that the prosecution had a sufficient stake in deterring the defendant's motion to suppress his confession, even though the government's case would not have been "eviscerated," nor would it have been required to "start 'from scratch,'" if the motion was successful. 85 F.4th at 382 (quoting *Ladeau*, 734 F.3d at 569). The defendant in *Zakhari* had been charged with attempting to persuade a minor to engage in illegal sexual activity, and the government secured a confession in which the defendant admitted that he knew the victim was fifteen years old and that it was wrong to engage in sexual activity with her because she was underage. 85 F.4th at 382.

19

Although the government had evidence of messages between the defendant and the victim that may have sufficed to convict him, the Court found a sufficient prosecutorial stake because "a confession is like no other evidence," and this particular confession was "especially compelling" in light of the defendant's defense that he did not believe the victim was underage. *Id.* (quoting *Arizona v. Fulminante*, 499 U.S. 279, 296 (1991)).  Thus, although the government may have been able to secure a conviction without the confession, it risked losing its most valuable piece of evidence if the defendant's motion was successful.  *See id.*

On the other hand, in *Moon*, the Sixth Circuit found an insufficient prosecutorial stake when the defendant twice successfully moved to dismiss the indictment, forcing the government to return to the grand jury to obtain new indictments, because the prosecution was still able to "resuscitate its case" on each occasion.  513 F.3d at 533.  Similarly, in *United States v. Georges*, our sister court concluded that although a successful severance motion required the government to expend "duplicative" efforts, the motion "did not force the government to restart its prosecution" or otherwise inflict a "mortal blow" on the government's case.  No. 2:20-cr-157, 2021 WL 3887183, at *3-4 (S.D. Ohio Aug. 30, 2021) (quoting *Ladeau*, 734 F.3d at 569).

In the present case, there is no significant prosecutorial stake in Waide's cooperation. For starters, the prosecution did not, and still does not, know how valuable or invaluable Waide's cooperation would have been.  It seems paradoxical to assert that a prosecutor's entire case or most valuable piece of evidence could be testimony or intelligence that they do not have.  At a minimum, the prosecution may have gained intelligence from Waide that ultimately did nothing to strengthen its case.  At most, the prosecution could have secured trial testimony from Waide implicating the co-Defendants.  Perhaps the prosecution had an interest in Waide's cooperation,

20

to the extent that it would have buttressed their case or saved them time and expense, but an interest or even strong desire does not rise to a significant prosecutorial stake.

Notably, the prosecutor emphasized to Waide on at least two occasions that he would likely not be required to testify against any of his co-Defendants and specifically noted that Waide's cooperation would be "almost exclusively" to his benefit.  [R. 221-6; R. 228-5.]  But even assuming that Waide's trial testimony was at stake, he cannot demonstrate that it would have been the kind of "crucial evidence" at issue in *Ladeau* or *Zakhari*.  On the contrary, the Sixth Circuit Pattern Jury Instructions provide that the jury should be instructed to treat a cooperating witnesses' testimony with "*more* caution that the testimony of other witnesses," and further instructs the jury to not convict a defendant based on the unsupported testimony of such a witness, unless believed beyond a reasonable doubt.  *See* Sixth Cir. Pattern Jury Inst. 7.07 (emphasis added).

Waide has provided no authority, and the Court is aware of none, to support his proposition that a potential witness' choice to not cooperate with the government could rise to the kind of prosecutorial stake that the vindictiveness standard demands.  Any additional burden that resulted from Waide's refusal to cooperate, if any, is minimal.  Whatever the prosecutor's intentions in proposing an offer to cooperate to Waide multiple times, a refusal to cooperate at most poses a burden on the United States akin to that of a routine pretrial motion, which has been held insufficient to amount to a prosecutorial stake.

**B**

In any event, Waide's motion otherwise fails because the prosecutor's conduct was plainly reasonable.  Through a broad lens, Waide's central argument appears to be that something seems amiss with regards to the prosecutor's conduct towards him over the last year.

21

Waide even concedes that the prosecutor's conduct in *this* case may not rise to vindictiveness, had he not been charged in a separate case for his unlawful possession of a firearm, even referring to the separate charge as the "crux" of the vindictiveness claim.[2] [R. 251 at 9.] Notwithstanding that a vindictiveness challenge to Waide's firearm charge would have been more properly considered in that case, the incongruity of this argument is present on its face.

Waide's contention that he has somehow become an improper target of prosecution is completely belied by the record. Viewing the circumstances surrounding Waide's involvement with law enforcement and the United States Attorney's Office through an objective lens, a more innocuous explanation becomes clear. Prior to any contact with Waide, law enforcement had been investigating the Lewis homicide as well as an unrelated shooting that occurred in October 2024 and sought to serve a search warrant for Waide's cell phone, due to Waide's suspected involvement in said events. *United States v. Waide*¸ No. 5:25-cr-73-GFVT-MAS [R. 1; R. 35 at 2, therein.] As noted above, when law enforcement attempted to execute that warrant, Waide fled inside a residence, grabbing his waistband as he ran. *Id.* Law enforcement later searched the residence and located a firearm and ammunition, which Waide was prohibited from possessing by virtue of two prior convictions for misdemeanor crimes of domestic violence. *Id.* at 2-3.

In September of 2025, Waide entered a plea of guilty to the firearm charge and admitted to all of the above facts. *See id.* From an objective view, it is clear that law enforcement was properly investigating Waide's involvement in two suspected crimes, the Lewis homicide and the October 2024 shooting, and throughout the course of that investigation, uncovered another

---

[2] Any suggestion that the United States would not have brought the firearm charge against Waide had he not refused to cooperate in the instant matter misconstrues the objective reasonableness standard because it would require the Court to undertake the precarious task of deciphering the prosecutor's subjective intent.

suspected crime, for which Waide was later prosecuted.  These events seemed "connected" because they are.  But the common thread that connects these events is not some nefarious prosecutorial motive, but rather, Waide's alleged and admitted involvement in multiple crimes.

Notably, Waide does not assert that he was not properly subject to prosecution for this crime, so the Court fails to understand how this should factor into the vindictiveness analysis, if at all.  Additionally, it seems a bit odd that Waide believes his refusal to cooperate with the government should cloak him with some kind of immunity from both the instant charge and the firearm charge, as well.  *United States v. Slatten*, 22 F.Supp.3d 9, 15 (D.D.C. 2011) ("[T]he presumption of vindictiveness is not intended to give the defendant a free ride for separate crime he may have committed. . .") (internal quotations and citations omitted).

To that end, the Court fails to see where Waide would draw the line between vindictive and reasonable prosecution.  Taking Waide's argument to its logical extreme, any time a prosecutor approached an individual for a proffer or request for cooperation, and that individual declined, even explicitly invoking their Fifth Amendment right against self-incrimination, under Waide's theory, the prosecutor would not be able to later prosecute that individual either for their alleged participation in that offense or any other offenses.  Seeing no clear delineation between the facts at hand and every other request for cooperation, the Court cannot adopt this theory.

Further, all parties agree that the United States could have charged Waide in the October indictment and subsequently made him an offer to cooperate in exchange for leniency, without raising any suspicion of prosecutorial vindictiveness.  [*See* R. 251 at 15.]  Of course, the posture of this case is exactly the opposite—the United States attempted to negotiate with Waide and then indicted him when those negotiations ultimately proved futile.  When asked why the former scenario is permissible and the latter is improper, Waide could not articulate any reason why the

23

Court should view them differently, other that noting that Waide was first approached outside the presence of counsel and prior to any prosecutorial involvement, so those interactions could not fairly be characterized as "plea bargaining." *Id.* at 5-6. If these interactions could not be characterized as "plea bargaining" because of the absence of a prosecutor, it is not clear to the Court how these instances could have contributed to prosecutorial vindictiveness.

Finally, Waide does not explain why, if the United States intended to vindictively punish him for his failure to cooperate, he was omitted from the first indictment. As the United States asserts, and Waide does not contest, there was no contact or attempted contact between the United States and Waide between the return of the original indictment and the return of the superseding indictment. All of Waide's purported exercises of protected rights occurred between August of 2024 and September of 2025. Strictly speaking, the exercise of any protected right did precede the alleged vindictive response, as required. But as a matter of common sense, it seems that any vindictive motive the United States may have possessed would have already manifested at the time the first indictment was sought. *Goff*, 400 F. App'x at 24 ("If the Government truly was retaliating against him for refusing to testify, it seems more likely that he would have been charged in the first indictment, just months after his refusal.").

"The imposition of punishment is the very purpose of virtually all criminal proceedings." *Goodwin*, 457 U.S. at 372. Here, Waide has not demonstrated that the actions taken against him were "an impermissible response to noncriminal, protected activity," rather than "a legitimate response to perceived criminal conduct." *Id.* at 372-73. In sum, Waide has not demonstrated either a significant prosecutorial stake in deterring the exercise of his rights, nor has he demonstrated that the prosecutor acted unreasonably. To that end, the United States is not required to provide "objective, on-the-record explanations" for its actions to rebut the

24

presumption of vindictiveness because there is no accompanying "reasonable likelihood of vindictiveness." *Ladeau*, 734 F.3d at 566.

## III

"The burden on defendants to obtain dismissal of charges due to vindictiveness, pretrial, is nearly insurmountable." *United States v. Williams*, No. 20-55, 2020 WL 5960689, at *16 (E.D. La. Oct. 8, 2020). Courts have intentionally applied the presumption of vindictiveness narrowly to accord prosecutors the freedom they need to make pretrial choices. "The due process principle that defendants not be deterred from exercising their rights is a limited one. . . . [M]any situations present difficult choices for defendants and arguably chill the exercise of a right." *Andrews*, 633 F.2d at 455.

Accordingly, and the Court being otherwise sufficiently advised, it is hereby **ORDERED** that the Defendant's Motion to Dismiss the Superseding Indictment **[R. 221]** is **DENIED**. An Order regarding the briefing deadlines for the Motion to Sever **[R. 222]** will be entered promptly.

This the 19th day of May, 2026.

Gregory F. Van Tatenhove
United States District Judge